Samuel H. BURR and Perfection Mattress & Spring Company, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

UNITED WHOLESALE AND WAREHOUSE EMPLOYEES, LOCAL 261, RETAIL, WHOLESALE AND DEPARTMENT STORE UNION, AFL–CIO, Respondent.

UNITED WHOLESALE AND WAREHOUSE EMPLOYEES, LOCAL 261, RETAIL, WHOLESALE AND DEPARTMENT STORE UNION, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 18748, 19080, 19162.

United States Court of Appeals Fifth Circuit.

July 18, 1963.

Mark L. Taliaferro, C. V. Stelzenmuller, Birmingham, Ala., for Samuel H. Burr and Perfection Mattress & Spring Co.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Melvin J. Welles, Atty., N. L. R. B., Washington, D. C., for N. L. R. B.

Jerome A. Cooper, Birmingham, Ala., Michael H. Gottesman, David E. Feller, Jerry D. Anker, Washington, D. C., for the Union.

Before RIVES, CAMERON and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This case deals with a secondary boycott under the 1959 Landrum-Griffin Amendments [1] to the Act. We hold that the consumer picket line constitutes a

---

[1]. These were added by the Labor-Managements Reporting and Disclosure Act of 1959, 73 Stat. 519. Reference to "Leg. Hist." denotes the two volume work, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 (G.P.O.1959). Concerning legislative background and legislative development see Cox, The Landrum-Griffin Amendments to the National Labor Relations Act, 44 Minn.L.Rev. 257 (1959); and also Aaron, The Labor-Management Reporting and Disclosure Act of 1959, 73 Harvard L.Rev. 1086, 1127 (1960); and Comment, The Landrum-Griffin Amendments: Labor's Use of the Secondary Boycott, 45 Cornell L.Q. 724, 768 (1960).

violation of § 8(b) (4) (i) and (ii).[2] We also hold that in some particulars the order should be made more precise. The result is that we sustain the Board's petition to enforce, Perfection's petition to reverse the order denying relief under § (i) and to make the order more specific, and deny the Union's petition to set aside the order adjudging a violation of § (ii). The case has a long and tortuous history. Begun in 1958 and now in its fifth year after three decisions by the Labor Board and two by Courts of Appeals, it still has life thanks, in no small measure, to intervening legislative changes. Perfection[3] is the primary employer. Subsequent to the designation of the Union[4] as the bargaining representative of its employees, Perfection and the Union engaged in extensive bargaining negotiations which lasted from July to October 1958. On October 14, 1958, the Union called a strike in support of its demands.

Perfection was able to continue its operations. It undertook to make deliveries to a number of retail furniture stores in the Birmingham area. Union representatives requested managers of the various retail stores to stop receiving or buying Perfection products. When such requests failed, the Unions immediately placed pickets at the entrances of those stores refusing to cease doing business with Perfection. This picketing continued until it was enjoined December 9, 1958, by an order under § 10(*l*), 29 U.S.C.A. § 160(*l*) pending action by the Board. This injunction was affirmed by this Court. Retail, Wholesale & Department Store Union, AFL-CIO v. Rains, 5 Cir., April 30, 1959, 266 F.2d 503. In December 1959, the Board issued its decision finding that the Union's picketing had violated § 8(b) (4) (A) of the 1947 Act. 29 U.S.C.A. § 158(b) (4) (A). United Wholesale and Warehouse Employees, Local 261, 125 NLRB 520. The § 10(*l*) injunction expiring by its own terms, the Union, although it had previously formally disclaimed any interest in further representing the employees, nevertheless resumed picketing of the same retail stores on March 10, 1960. Presumably it desired to test the 1959 Amendments. It is upon this picketing that the Board's order now before this Court is based. Within a few months the Court of Appeals for the District of Columbia by a divided court set aside the Board order finding the 1958 picketing to be an unfair labor practice. United Wholesale & Warehouse Employees, Local 261 v. N. L. R. B., July 7, 1960, 108 U.S.App.D.C. 341, 282 F.2d 824. The Court of Appeals rejected the Board's conclusion "that the picketing activity had as its necessary effect the inducing and encouraging of employees to engage in a work stoppage."

On the basis of charges filed by Perfection, the Board issued a complaint alleging violations by the Union of § 8 (b) (4) (i) and (ii) (B). The parties waived a hearing and agreed to submit the case to the Board on stipulated facts which also included the entire record in the original § 10(*l*) injunction proceed-

---

2. As amended the statute now reads: "§ 8(b). It shall be an unfair labor practice for a labor organization or its agents— * * *
   "(4)
   "(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities, or to perform any services; or
   "(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
   * * *
   "(B) forcing or requiring any person to cease using, selling, handling, transporting or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * *."

3. Perfection Mattress & Spring Company is a manufacturer of mattresses, springs, furniture and allied products.

4. United Wholesale and Warehouse Employees, Local 261, Retail, Wholesale and Department Store Union, AFL-CIO.

ing. On December 28, 1960, the Board issued its order, 129 NLRB 1014, holding that the 1960 picketing violated both §§ (i) and (ii). Perfection petitioned for review under § 10(e) on the ground that the provisions of the cease and desist order, stated as they were in statutory language, were too vague and indefinite upon which to secure effective compliance through contempt or other coercive sanctions.[5] On August 17, 1961, the Board filed a motion in this Court for leave to modify its decision on the ground that by subsequent decision after a change of its membership the Board had in a subsequent case [6] held that there was no § (i) violation. We denied the motion to modify but remanded the proceedings to the Board for limited reconsideration and filing of an amended or supplemental order meanwhile retaining jurisdiction of the subject matter. Following this, on December 4, 1961, the Board issued a supplemental decision and amended order finding no § (i) violation. 134 NLRB 99. The result is that the order is now confined to a violation of § (ii). The Board and Perfection seek enforcement of that order. The Union seeks denial of enforcement. Perfection seeks, in effect, a reinstatement of the finding of a § (i) violation and both Board and Union oppose this. Perfection, opposed by both Board and Union, further attacks the vagueness of the order as to either one or both of § (i) and (ii).

By stipulation the record upon which the Board acted included the testimony in the 1958 § 10(l) injunction proceedings. This record showed that Union representatives had stated in various ways to managers of a number of retail furniture stores that they were going to "picket the stores and try to stop the trucks that was coming in from Perfection." When a store manager declined to cease purchasing Perfection merchandise, pickets shortly appeared. At one store, due to confusion in similar names, the pickets were withdrawn when the Union was assured that Perfection merchandise would not be sold. This assurance was enough for the Union to conclude that the retailer's conduct would not have "violated the picket line." Further, at one store (Willoughby) pickets loudly shouted about "junk in the [show] window that is made by scab labor" and when Willoughby remonstrated about this, the picket became harsh and impudent resulting in a further exchange of harsh words between the picket and another employee. On another occasion at Willoughby's, there was repeated inquiry as to the home address of a servant of Willoughby's as she crossed the picket line. On another occasion at Ross Black Furniture Company, pickets became loud and boisterous shouting several times they "would never cross a picket line, even to pay a bill, it's a good excuse not to pay it." These statements were made in the hearing of one or more employees.

Though the evidence did not show any picketing of delivery entrances as such, or actual interference with deliveries, the record is clear that the presence of the pickets was known to all employees. Some employees of the retail stores regularly left before the pickets. Employees could see the picket signs through windows and doors. Many employees customarily went in and out of the front entrances of the stores all throughout the day for coffee, lunch, errands and the like. Many came to and left work customarily through the front entrances.

5. The Board then filed its petition for enforcement (No. 19080) and subsequently the Union's petition (No. 19,162) filed in the District of Columbia Circuit was transferred by that Court to this one on July 27, 1961.

6. Upholsterers Frame & Bedding Worker (Minneapolis Home Furnishing Co.), July 11, 1961, 132 NLRB 2. Member Fanning, who had dissented as to § (i) in the Perfection order of December 28, 1960, 125 NLRB 520, was joined by new members McCullough and Brown leaving the former majority, members Rodgers and Leedom, as the presently dissenting minority.

The sign carried by the pickets bore this legend in large letters:

"Products made by Perfection Mattress and Spring Company are made by nonunion labor. As a consumer please do not buy them. Local 261, AFL-CIO."

In addition to the § 10(*l*) evidence, further facts concerning the picketing which resumed March 10, 1960, were stipulated. "In furtherance of its dispute with Perfection," the Union "picketed at the * * retail stores in * * * Birmingham, at entrances commonly used by customers and some employees." Such "picketing was peaceful * * * and was limited to not more than one picket at any one time * * *" who "* * * was on the public sidewalk in front of the store and carried a picket sign * *" which was identical to the 1958 sign except it was prefaced by the words "To the Consuming Public—." The pickets arrived after and left before the times store employees normally arrived or departed. Pickets were not placed at the service or delivery entrances. But "employees of the stores could see, and some saw, the picket sign from inside the stores, and also when, as some employees did, such employees used the public entrances * * * to enter or leave in the course of a day." No request was made of truck drivers or delivery men to refuse to make deliveries "and no such employee refused to make any such delivery." Since December 1958 no appeal other than by picketing has been made by the Union "directly to employees of the retail stores, or any other person or persons, including the retail store employers handling retail products of Perfection." There "has been no work stoppage at any time * * * by employees of" the "retail stores" being picketed and "no employee of the stores quit work or indicated any inclination or intention to do so, or to refuse to handle Perfection-made products as a result of or during the picketing."

It is crystal clear that the *object* of the picketing was one proscribed by subsection (B). As the stipulation categorically states, the picketing was "in furtherance of [the Union's] dispute with Perfection." The Union first sought to obtain an agreement from the retail stores not to handle Perfection's goods and failing in this, picket lines were immediately established and thereafter maintained. The only issues in the case, therefore, relate to the legality of the *means* used by the Union in its effort to force a cessation of business between the neutral retail stores and Perfection. Whatever doubts there might be as to § (i), none exists as to § (ii).

Consumer picketing at the premises of neutral secondary employers is clearly condemned by § (ii). This subparagraph was added in 1959 to close a major loophole. While § 8(b) (4) of the Taft-Hartley Act prohibited inducing and encouraging the "employees" of a neutral employer, the Board and Courts had held that this did not prevent a union from exerting coercive pressures directly on the neutral employer. Consequently, unions were free to use the effective weapon of the secondary consumer picket line to coerce the neutral retail store to discontinue doing business with the primary employer.[7]

The legislative history of the 1959 Amendments is convincing that where the object of the consumer picket line is to force the neutral to cease doing business with another, this action is "to threaten, coerce, or restrain * *" the neutral contrary to § (ii). President Eisenhower strongly recommended amendments to the Taft-Hartley Act to prohibit "the direct coercion of employers to cease or agree to cease doing business with other persons * * *." I Leg. Hist. 80–82. In support of this

---

7. See, e. g., N. L. R. B. v. Business Machine & Office, etc., Local 459 (Royal Typewriter), 2 Cir., 1955, 228 F.2d 553, 559–561, cert. denied, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483; N. L. R. B. v. International Union of United Brewery Workers, 10 Cir., 1959, 272 F.2d 817, 819.

the Secretary of Labor characterized direct coercion of employers as having an effect "no less damaging upon employers and employees and no less contrary to the public interest than is the type of secondary activity presently prohibited * * *" in which the pressure is put on employees, not secondary employers. II Leg. Hist. 990, 994. This was also reflected by strong protests against inadequacies of earlier legislative proposals. I Leg. Hist. 397, 475. Terminology eventually enacted as § (ii), described as "the secondary boycott provisions of" the administration's bill, was stated by a co-sponsor to have "the effect" of closing the "loopholes which permit unions to instigate effective secondary boycotts" by threats or coercion against the secondary employer or his supervisory personnel. II Leg. Hist. 989. It is clear from the numerous legislative exchanges that Congress intended the words "threaten, coerce, or restrain" to prohibit peaceful consumer picketing at the site of the secondary retail employer. Thus "the picketing of customer entrances to retail stores selling goods manufactured by a concern under strike" when "the purpose of the picketing is to coerce or restrain the employer of the [secondary] establishment * * *" would be covered by the Landrum-Griffin Bill and "such a boycott could be stopped." II Leg. Hist. 1615. See also II Leg. Hist. 1037 and 1426.

There is also internal evidence in the structure of the Amendments to show that Congress had picketing, as such, clearly in mind. Thus the so-called publicity proviso of § 8(b) (4) declares that for purposes of paragraph (4) "nothing contained in such paragraph shall be construed to prohibit publicity, *other than picketing*, for the purpose of truthfully advising the public, including consumers * * * that a product * *" is produced by a primary employer with whom the union has a dispute. Of this the then Senator Kennedy explained, "We were not able to persuade the House conferees to permit picketing in front of that secondary shop, but we were able to persuade them to agree that the union shall be free to conduct informational activity short of picketing." II Leg. Hist. 1431–1432; and see Leg. Hist. 1822, 1843, 1857.

To this the Union makes a basic response. It urges that for consumer picketing to come within the language "to threaten, coerce or restrain" it must be shown to do so in fact in the particular case. This conclusion is required, so it argues, because otherwise the section would be an unconstitutional deprivation of First Amendment free speech. A part of this argument seems to be that had Congress meant to outlaw consumer picketing, it would have done so in explicit terms since in the proviso to § 8(a) (4) and in § 8(b) (7), Congress legislated in terms of picketing. This latter contention is without substance and may be quickly disposed of. In the first place, § 8(b) (7) is intentionally limited to picketing, whereas § 8(b) (4) (ii) is not. Likewise where the object is that condemned in § (ii) (B), it is obvious that peaceful picketing is outlawed as a means employed "to induce or encourage" any employee to engage in a strike or refusal to perform services under § (i).

On the basic objection the Union recognizes that consumer picketing might constitute the prohibited threat, coercion or restraint. But by emphasis on Representative Griffin's explanation that the "coercion [made] unlawful" by § (ii) is "economic retaliation" against the secondary employer "in order to force him to cease doing business with a primary employer," II Leg. Hist. 1523(*l*), and Senator Goldwater's statements that the proposed amendment would make "such picketing * * * illegal * * *" if carried on "for the purpose of inducing consumers not to patronize company B (the secondary employer) * * *." II Leg. Hist. 1857(2), the Union's position is that there is no economic threat or coercion unless consumers are urged not to patronize the secondary employer at all. Conversely, the argument runs, consumer picketing urging customers not to purchase the goods of the primary

employer subjects the secondary employer to none of the prohibited pressures. The Union finds considerable support for this approach in the decision of the District of Columbia Court of Appeals in Fruit & Vegetable Packers & Warehousemen v. N. L. R. B., D.C.Cir., 1962, 308 F.2d 311.[8] That Court first recognized that the Board's view that the § 8(b) (4) proviso reflects the draftsman's assumption that in the absence of the proviso all secondary publicity would be banned "because it necessarily threatens, coerces or restrains" a neutral employer "can be squared with the statutory language." But it then concluded that this was "a less plausible reading of the statute." On this the Court reached the conclusion that "the most plausible reading" of § (ii) is that it "outlaws only such conduct (including picketing) as in fact threatens, coerces or restrains secondary employers." 308 F.2d 311, 315. As thus construed, the statute "condemns not picketing as such, but the use of threats, coercion and restraint to achieve specified objectives. * * *" Consequently, since in that case "there was no work stoppage, no interruption of deliveries, no violence or threat of violence" and there was no showing that the picketing "caused or was likely to cause substantial economic injury" to the secondary employer, or that "consumers felt 'coerced' by" the presence of the pickets, the cease and desist order was set aside. 308 F.2d 311, 317, 318.

We cannot accept these economic or legal contentions of the Union, and in rejecting them we also decline, with great deference, to follow Fruit & Vegetable Packers & Warehouse v. N. L. R. B. supra. Only a brief statement of our reasons is required.

■■ At the very outset we think the judgment of the coercive, restraining, threatening effect of certain activities is one made by Congress in its determination of the underlying public policy. In legislating with respect to secondary boycotts, Congress was aware that the most vivid and spectacular weapon is the picket line. Since the purpose of the proposed Amendments was to protect secondary *employers* and not merely *employees* of secondary employers, it was evident that the consumer picketing was one of the most likely weapons which had been and would be employed. Through its various committees and in extensive hearings on many phases of labor problems, Congress was aware of the power generated against a neutral by the presence of a picket line. The effect of this picket line was twofold. First, it subjected a neutral to possibly devastating effects as a result of a controversy in which he had no real part. But equally important, it subjected the primary employer to economic forces and pressures which Congress declared had a disruptive effect in the relations between an employer and his own employees in the collective bargaining process. It is a mistake, in our judgment to assume as does the District of Columbia decision, that the secondary employer was the sole object of congressional protection. To the contrary, in the legislative development and in the operative effect of the Act, it is evident that Congress made a fundamental judgment as a part of its basic labor policy. Congress determined that in bargaining with representatives of their own employees, it was undesirable for primary employers to be subjected to cyclonic economic pressures through the loss of business brought about through coercive actions directed by the union toward persons through whom one's goods are sold or distributed. The important factor, of course, is the element of coercion against the neutral. For the Amendments recognize that under some circumstances there may be a lawful, voluntary, cessation of business. But the final effect of § (ii) is to relieve both the neutral, secondary employer as well as the primary employer of the pressures generated through such coercive action.

■ It is at this point that the Union's economic theory breaks down. It

8. Noted, 62 Colum.L.Rev. 1336 (1962); 51 Geo.L.J. 201 (1962).

seems to assume that while a consumer picketing urging a *complete* boycott would be prohibited, this consequence does not attach if the plea is confined merely to the products of the primary employer. This is fallacious on at least two grounds. Perhaps the foremost is the damaging effect of any picket line posted in front of any retail establishment in the contemporary world of the highly developed organized trade unionist movement.[9] Even more directly, a plea not to buy a particular product is in effect a plea not to trade with the secondary employer at all. The secondary employer as a merchant may determine, for example, that to afford to his customers appliances or products which will give the best service at the least cost, the self-interests of the secondary employer in generating good will for future business will be best served by stocking the line of a particular manufacturer. This was certainly true on this record, for example, as to mattresses produced by Perfection. But a merchant stocking, promoting and selling—or trying to sell—a particular line cannot long endure if his potential customers are being urged not to buy. This may have a multiple effect. It freezes existing inventory, it reduces, if not eliminates the need for acquisition of new inventory. Two choices are open. If the merchant may decide to stay in that business, he must turn to a competing product. Or he may decide to withdraw from the market. In either event the consequence is to cause the merchant to cease doing business with the primary employer. And, of course, the decision to do so is brought about by the prohibited means of urging customers not to buy.[10]

The fallacy of the approach of the Fruit & Vegetable case is demonstrated by the fact that its standard effectually deprives § (ii) of any real utility. The thesis of that decision is that the adverse economic effect [11] of the consumer picket line must be demonstrated affirmatively as a fact. That means that to obtain the protection afforded by Congress against the *threat* of injury, a party must first be injured. And if it is actual injury, what is to be the test of injury? If, for example, under the union's threat of posting a consumer picket line, a secondary retailer knuckles under as some did in Servette, Inc. (see note 10, *supra*), what must that retailer show? Must he prove not only that he lost the opportunity of making the average number of sales of that product, but also that this was not offset by substituted products of competitor suppliers? Must the retailer demonstrate by identified customers that some refused to (a) purchase the picketed product or (b) patronize him at all? These and many other questions which would inhere in every secondary con-

9. See, e. g., McLeod v. Business Machine & Office Appliance Mechanics Conference Board, 2 Cir., 1962, 300 F.2d 237, especially note 15 and appended text, and Judge Moore's dissent, note 1, as a judicial recognition of a fact of modern life that the mere presence of pickets at a retail establishment has the capacity for either great persuasiveness or great damage, depending on the point of view, even though the retail establishment does not sell any product of the primary employer.

10. As picketing is excluded from the proviso authorizing publicity under limited circumstances and the method used here was plainly picketing, we do not face questions concerning the means or method available or permissible under the proviso. See, e. g., Great Western Broadcasting Corp. v. N. L. R. B., 9 Cir., 1962, 310 F.2d 591; Servette, Inc. v. N. L. R. B., 9 Cir., 1962, 310 F.2d 659.

11. This "effects" test interjected by the Fruit & Vegetable case is contrary to the long established doctrine under § 8(b) (4) that a violation of this provision does not depend upon the success or failure of the union efforts in achieving the prohibited objective. "If the intended effect of the picketing be a prohibited one, the lack of success in coercing the neutral employees is immaterial. * * *" N. L. R. B. v. Dallas General Drivers, Local 745, 5 Cir., 1959, 264 F.2d 642, 648, cert. denied, 361 U.S. 814, 80 S.Ct. 54, 4 L.Ed.2d 61. Likewise, when Congress made the "effects" of an activity significant, it specifically said so. See, e. g., Second Proviso to § 8(a) (4) and Second Proviso § 8(b) (7) (c).

sumer picketing demonstrate convincingly why Congress could not have intended that an Amendment designed to close a major and serious loophole would be stripped of all practical utility either by requiring that threatened damage be actually sustained, or that one feeling the pinch furnish specific answers to metaphysical inquiries as to the harm suffered.

■■■■ We are equally firm that constitutional considerations do not require any such reading. Phrasing it differently, a legislative proscription of secondary consumer picketing does not abridge First Amendment free speech. It is, of course, almost always a mistake to speak in doctrinaire terms concerning basic constitutional guaranties. Consequently, we do not rule out the possibility that under some circumstances literal enforcement of § (ii) might constitute an infringement. But several factors sustain validity in this case. First, the means of communicating the message to members of the public, including customers, actual or potential, of any secondary employer are effectually open through the § 8(b) (4) proviso. Second, the law reckons with the fact that picketing is something more than mere communication of information. Hughes v. Superior Court, 1950, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985. It "establishes a *locus in quo* that has far more potential for inducing action or nonaction than the message the pickets convey." Building Service Employers International Union v. Gazzam, 1950, .339 U.S. 532, 537, 70 S.Ct. 784, 787, 94 L. Ed. 1045. And these "compulsive features inherent in picketing" give it a character beyond "mere communication as an appeal to reason." Hughes v. Superior Court, supra, 339 U.S. 460, 468, 70 S.Ct. 718, 723, 94 L.Ed. 985. As picketing is "not * * * the equivalent of speech as a matter of fact," it "is not its inevitable legal equivalent," Hughes v. Superior Court, supra, 339 U. S. 460, 465–466, 70 S.Ct. 718, 721–722, 94 L.Ed. 985.

■■■■ The evil here condemned by the 1959 Amendments is the pressures imposed on secondary and primary employers through coercive restraints, or the threats of them, on the secondary employer or those working for him. Notwithstanding sweeping and earlier broad pronouncements in terms of free speech, it is now recognized that Congress or the states may in enforcing a valid public policy, "constitutionally enjoin peaceful picketing aimed at preventing effectuation of that policy." International Brotherhood of Teamsters v. Vogt, Inc., 1957, 354 U.S. 284, 293, 77 S.Ct. 1166, 1170–1171, 1 L.Ed.2d 1347. Since states may take this protective action "[t]here is no reason why Congress may not do likewise." International Brotherhood of Electrical Workers v. N. L. R. B., 1951, 341 U.S. 694, 705, 71 S.Ct. 954, 960, 95 L.Ed. 1299. In our view of the evolutionary development of free speech and picketing,[12] we do not share the view of the District of Columbia Court of Appeals which regards as the distinguishing element the presence or absence of a likelihood that the particular picketing will be a "signal" for action by the *employees* of the secondary employer.[13] One thing

12. See Wooton v. Ohler, 5 Cir., 1962, 303 F.2d 759, p. 764, note 9, tracing the development from Thornhill v. Alabama, 1940, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093, and to which these cases may be added: Hughes v. Superior Court, supra; N. L. R. B. v. Denver Building & Construction Trades Council, 1951, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284; International Brotherhood of Electrical Workers v. N. L. R. B., supra; International Brotherhood of Teamsters v. Hanke, 1950, 339 U.S. 470, 70 S.Ct. 773, 94 L.Ed. 995; Local 10, United Association of Journeymen v. Graham, 1953, 345 U.S. 192, 73 S.Ct. 585, 97 L.Ed. 946; N. L. R. B. v. United Brotherhood of Carpenters, 10 Cir., 1950, 184 F.2d 60, cert. denied, 341 U.S. 947, 71 S.Ct. 1011, 95 L. Ed. 1371. See also Gregory, Constitutional Limitations on the Regulation of Union and Employer Conduct, 49 Mich.L. Rev. 191, 205 (1950).

13. See Cox, The Landrum-Griffin Amendments to the National Labor Relations Act, 44 Minn.L.Rev. 257, 274 (1959), pointing out that Congress did not import the distinction between "signal" and "publicity" picketing into § 8(b) (4) (ii).

622

is certain from the 1959 Amendments. Congress regarded the pressuring of a secondary *employer* as much an evil as efforts to induce or encourage his employees to strike or not handle goods. The aim of the law is to free interstate commerce from the disruptive consequences of labor strife. In the legislative judgment, to "signal" *persons* into a sympathetic refusal to handle goods is no more obstructive than to bring about the same ultimate objective—cessation of business with the primary employer—through coercive pressures on the secondary employer. To tag one method as "consumer picketing" does not afford a constitutional insulation denied to the other. When the purpose of the conduct is the same, it is for Congress to determine that similar restraints may be imposed.

▆▆▆▆ Sustaining the Board's Order, as we do, under § (ii), we must now consider whether the Board's denial of § (i) violation can be upheld.[14] We conclude that the Board should have found the Union guilty of inducing or encouraging

persons employed by the retail stores to cease handling goods, etc. in order to achieve the objective of having the retail stores cease doing business with Perfection. § 8(b)(4)(i). On these very same facts the Board twice held that the Union was guilty of prohibited conduct. Once was under the 1947 Act (125 NLRB 520), the other time under the 1959 Amendments (129 NLRB 1014). It is true that the District of Columbia Court of Appeals denied enforcement of the initial order.[15] But as to these very same charges, we had earlier held that there was at least probable grounds for an interim § 10(*l*) injunction.[16] What brought about the change in the Board's factual conclusion? One thing is positively clear. The change did not come about from any change in the facts. The facts, as shown in the § 10(*l*) 1958 record and the 1960 stipulation, remained the same. What—and all—that changed was the Board's approach as former dissenting minorities found themselves in the majority as changes in the membership of the Board occurred.[17] Thus it

14. We agree with the Board's brief that in view of Perfection's initial petition challenging the scope and content of the Order entered by the Board, the question is open and presented for review as a consequence of the Board's reversal of its former Order after remand under this Court's permissive Order. 134 NLRB No. 99.

15. United Wholesale & Warehouse Employees Local 261 v. N. L. R. B., 1960, 108 U.S.App.D.C. 341, 282 F.2d 824.

16. Retail, Wholesale & Department Store Union, AFL-CIO v. Rains, 5 Cir., 1959, 266 F.2d 503.

17. Both as to this particular § (i) problem and generally in support of its argument that unpredictability of Board decision makes it essential that the final Order be more specific, Perfection's brief cites a number of other recent instances of what it calls abrupt changes in Board "policy" or decision. "To induce or encourage": Teamsters Local 768 (Tree Fruits Labor Relations Committee), 132 NLRB No. 102; IUE Local 459 (Novelty Veiling Company) 134 NLRB No. 61; "Any individual employed by any person": Teamsters Local 505 (Carolina

Lumber Co.), 130 NLRB No. 1438; National Furniture Mfg. Co. (Teamsters Local 215), 134 NLRB No. 84; Plumbers Local 519 (Babcock Co.), 137 NLRB No. 46; Wholesale Delivery Drivers Union (Servette, Inc.), 133 NLRB No. 152; Upholsterers Union (Minneapolis Home Furnishing Co.), 132 NLRB No. 2; "Threaten": Teamsters (Lohman Sales Co.), 132 NLRB No. 67; Teamsters Local 968 (Schepps Grocery Co.), 133 NLRB No. 139; UE Local 73 (Northwestern Construction of Washington), 134 NLRB No. 46; Plumbers Local 519 (Babcock Co.), 137 NLRB No. 46; Upholsterers Union (Minneapolis Home Furnishing Co.), 132 NLRB No. 2; Television & Radio Artists (Great Western Broadcasting Corp.), 134 NLRB No. 141; Teamsters Local 901 (El Imparcial, Inc.), 134 NLRB No. 83; "Picketing": Teamsters (Lohman Sales Co.), 132 NLRB No. 67; Teamsters Local 968 (Schepps Grocery Co.), 133 NLRB No. 139; IBEW Local 712 (Golden Dawn Foods), 134 NLRB No. 73; Plumbers Local 519 (Babcock Co.), 137 NLRB No. 46; Local 202, Radio and Television Technicians (Packard Bell Electronic Corp.), 134 NLRB No. 141; Upholsterers Union (Minneapolis Home Furnishing Co.), 132

was that after this record and case was pending before us on the various petitions for review, the Board formally sought leave to (a) modify its Order or, alternatively, (b) to remand the case for reconsideration of the § (i) finding in the light of its later decision in Upholsterers Frame and Bedding Workers (Minneapolis Home Furnishing Company), July 1961, 132 NLRB 2.

■ At the very outset we should make it clear that we are not faced with the problem of "overruling" the decision of the District of Columbia Court of Appeals in United Wholesale & Warehouse Employees Local 261 v. N. L. R. B., 1960, 108 U.S.App.D.C. 341, 282 F.2d 824. We may assume that decision forecloses what was there presented though, as we point out later on, our cases would have led this Court to a contrary result. The fact is that the present Order is not based on the 1947 Act as was that decision. It is based on the Act as amended in 1959. These Amendments changed former § 8(b) (4) (A) in at least two significant ways. First, there was the elimination of the "employee" loophole accomplished by substituting the phrase "any individual employed by any person" for the former phrase "the *employee* of any employer." The second was the elimination of the requirement of "concert-

ed" refusal to work, strike, etc. Though these two changes are not technically presented in this aspect of the present case, we reject the notion faintly urged by the Board that because of this, we must view this case now as though there had been no changes in the statute so far as inducing or encouraging employees of the secondary employer to resort to self-help. But we do not read this statute like a contract. These and all other changes manifested a strong congressional dissatisfaction with judicial actions and many judicial opinions. The addition of new elements and rearranging them into the structure of §§ (i) and (ii) were a part of the general purpose to make prohibitions effective against the evils thought to inhere in secondary boycotts. Consequently, we must review Board action on the basis of the amended Act unhindered by the intervening judicial decision based upon the former legislation.

■ When so done, we think that our prior decisions in N. L. R. B. v. Dallas General Drivers, Local 745, 5 Cir., 1959, 264 F.2d 642, cert. denied, 361 U. S. 814, 80 S.Ct. 54, 4 L.Ed.2d 61; and Superior Derrick Corp. v. N. L. R. B., 5 Cir., 1960, 273 F.2d 891, cert. denied, 364 U.S. 816, 81 S.Ct. 47, 5 L.Ed.2d 47,[18] require us to hold that the Board's

NLRB No. 2; Plumbers Local 142 (Shop Rite Foods), 133 NLRB No. 33; Plumbers Local 510 (Babcock Co.), 137 NLRB No. 46; Window Cleaners Local 125 (Atlantic Maintenance Co.), 136 NLRB No. 105; Service & Maintenance Employees Union (Burns Detective Agency), 136 NLRB No. 34; Teamsters Local 182 (Woodward Motors), 135 NLRB No. 90; "Truthfully advising the public": Teamsters Local 537 (Lohman Sales Co.), 132 NLRB No. 67; National Furniture Mfg. Co. (Local 215 Teamsters), 134 NLRB No. 84; "Product or Products * * * produced by": Teamsters Local 537 (Lohman Sales Co.), 132 NLRB No. 62; IBEW Local 712 (Golden Dawn Foods), 134 NLRB No. 73; UE Local 73 (Northwestern Construction Co.), 134 NLRB No. 46; IBEW Local 662 (Middle South Broadcasting Co.), 133 NLRB No. 165; Television & Radio Artists (Great Western Broadcasting Corp.), 134 NLRB No.

141; Typographical Union (Ypsilanti Press), 135 NLRB No. 96.

Other significant changes are pointed to. See as to "ambulatory picketing" IBEW Local 861 (Plauche Electronic, Inc.), 135 NLRB No. 41 overruling Washington Coca-Cola Bottling Works, 107 NLRB 299. See also Hod Carriers Local 41 (Calumet Contractors) 133 NLRB No. 57; Automobile Workers (Fanelli Ford Sales, Inc.), 133 NLRB No. 163; also General Motors Corp., 134 NLRB No. 116; General Motors Corp., 133 NLRB No. 21; Ideal Electric Co., 134 NLRB No. 133; Sheffield Corp., 134 NLRB No. 86; May Department Store, Inc., 136 NLRB No. 71.

18. In this case we also found it necessary to register our differences with the Court of Appeals for the District of Columbia. We there declined to follow its decision in Seafarers International

reversal of its decision as to § (i) in the third, last, and supplemental Order, 134 NLRB No. 99, cannot be sustained. In brief, those cases rest on a recognition of the fact that the real "message" from such picketing is not measured by the signs or legends or pamphlets carried or handed out by the pickets. Applying the principles developed in decisions sustaining constitutionality of restrictions on picketing (see note 12, *supra*), these cases point out that a picket line is an appeal for others to join forces with employees of the primary employer. As the Board itself pointed out in its earlier decision, the "foreseeable consequence" and "the natural and probable result" of such a secondary picket line "is to induce a strike * * *." Real distinctions cannot be made on the ground, say, that the signs in Dallas Drivers used words such as "unfair," or "strike." Courts need not be blind to what all others know. Union adherents are hardly so dense or objective that these things must be spelled out in words intelligible to the youngest child. For one union through pickets to say to other union members approaching a business establishment as potential customers that such store sells goods made by nonunion workers or by strike breakers displacing union workers during labor controversy does not soften the blow. This carries exactly the same message as the more vivid, fighting words of "scab," "unfair," "strike-breaker," or the like. The impact on workers is no less on one side of the line than on the other.

For the same reasons developed in our prior decisions, we think that in this case the conduct of the picket line was to induce or encourage employees of the stores to refuse to handle goods manufactured by Perfection. Pertinent to this are the incidents described at the outset showing specific actions directed by the pickets to employees of the stores calculated to shame or embarrass them into not crossing the picket line, etc.[19]

This brings us then to Perfection's petition for review which attacked the Order because it was too general and vague. As originally entered covering both §§ (i) and (ii) violations, the cease and desist order against the Union was in statutory terms.[20] The only change by the supplemental order on remand was to eliminate the paragraph as to § (i).

Perfection makes two principal contentions. The first is that since the power of contempt may be the sole means of obtaining compliance, great heed should be paid to numerous decisions pointing out the necessity for defining as accurately as possible just what it is a party may or

Union v. N. L. R. B. (Salt Dome Production), 1959, 105 U.S.App.D.C. 211, 265 F.2d 585; see Superior Derrick Corp. v. N. L. R. B., 5 Cir., 273 F.2d 891, 896.

19. In view of this approach we need not determine whether a manager of a retail store is an "individual employed by any person" under § (i). Compare Servette, Inc. v. N. L. R. B., 9 Cir., 1962, 310 F.2d 659, 667, with N. L. R. B. v. Local 294, International Brotherhood of Teamsters, 2 Cir., 1961, 298 F.2d 105, which reads into the term "individual employed by" the element of the likely loyalties to workers versus management, or vice versa.

20. Original order provided:
"1. Cease and desist from:
"(a) engaging in or inducing or encouraging any individual employed by Willoughby Furniture Company or Braswell Furniture Company, retail furniture dealers in the Birmingham, Alabama, area, or by any person engaged in commerce or in an industry affecting commerce, to engage in a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or
"(b) threatening, coercing, or restraining Willoughby Furniture Company or Braswell Furniture Company, or any other person engaged in commerce or in an industry affecting commerce; where, in either case, an object thereof is to force or require said retail furniture dealers in the Birmingham, Alabama, area, or any other person, to cease doing business with Perfection Mattress & Spring Company."
The supplemental order deleted subparagraph (1) (a) and made a slight conforming editorial change in (b).

may not do under the injunctive order.[21] The second is that since the institution of contempt proceedings of the Court of Appeals' Order of enforcement of a Labor Board decision is left to the Board alone, not a charging or other interested party,[22] the Order should be specific so that the affected primary and secondary employers are not left to the administrative whim or discretion of the Board or its General Counsel in the preliminary determination of whether the subsequent conduct does, or does not, in the words of the statute repeated in the Order constitute prohibited § (i) or (ii) action. This latter is particularly important, Perfection contends, because of the undulating decisions of the Board in matters bearing upon § 8(b) (4) (i) and (ii) (B) (see note 17, *supra*). This leads Perfection to urge us to define what is picketing, just what pickets may do in hand billing, what constitutes truthful publicity under the proviso, and the like.

Although we agree generally with the approach that orders setting in train the sometimes formidable force of a contempt proceeding, Cone Bros. Contracting Co. v. N. L. R. B., 5 Cir., 1956, 235 F.2d 37, should be as particular as possible, and attention has recently been focused on the necessity that administrative agencies do more than parrot the statute,[23] we are loath to pinpoint too exactly all of the things which might infringe the Order which we now require to be enforced as modified. Two factors, among others, bear on this. The first is that the administrative agency and process should not be artificially restricted where the particular incidents

adjudged to violate the Act are illustrative of discriminatory practices which may take many forms. Cf. N. L. R. B. v. R. L. Zeigler, Inc., 5 Cir., 1962, 298 F.2d 671, at 673. Second, many of the things earnestly apprehended by Perfection may never come to pass. Expressions today will necessarily be academic advice not related to a case or controversy. We do think, however, that especially in view of the § 8(b) (4) proviso, there should be no doubt that consumer picketing of the kind here involved is to be prohibited. After all of this lengthy, prolonged, costly, judicial travail, future similar conduct ought not to require relitigation of whether this is conduct forbidden by §§ (i) and (ii). Perhaps this and other matters related to this actual record should be explicitly covered in the Order, but we refrain from extended discussion since the settling of the form of the decree to be entered by this Court is the subject of further action under our Rule 38.

Order enforced in part.

Order modified in part.

Order reversed in part.

RIVES, Circuit Judge (concurring in part and dissenting in part).

I agree with the Board's Decision, but think that its Order should be made more explicit. Stated otherwise, I concur in the able opinion of my Brother Brown except that part holding that the consumer picket line constituted a violation of § 8(b) (4) (i) (B). I agree with the Board's Supplemental Decision that the Union's consumer picketing at the retail

21. Phelps Dodge Corp. v. N. L. R. B., 1941, 313 U.S. 177, 197, 61 S.Ct. 845, 85 L.Ed. 1271; N. L. R. B. v. Express Publishing Co., 1941, 312 U.S. 426, 433, 61 S.Ct. 693, 85 L.Ed. 930; May Department Stores Co. v. N. L. R. B., 1945, 326 U.S. 376, 388–393, 66 S.Ct. 203, 90 L.Ed. 145; N. L. R. B. v. Bell Oil & Gas Co., 5 Cir., 1937, 91 F.2d 509; Swift & Co. v. United States, 1905, 196 U.S. 375, 401, 25 S.Ct. 276, 49 L.Ed. 518. Precision in meaning is particularly important if contempt depends on "willfulness" or attitudes akin to it. See N. L. R. B. v. Athens Mfg. Co., 5 Cir., 1947, 163 F.2d 255.

22. Amalgamated Utility Workers v. Consolidated Edison Co., 1940, 309 U.S. 261, 60 S.Ct. 561, 84 L.Ed. 738; N. L. R. B. v. Lawley, 5 Cir., 1950, 182 F.2d 798; May Department Stores Co. v. N. L. R. B., 1945, 326 U.S. 376, 388–393, 66 S.Ct. 203, 90 L.Ed. 145.

23. See Judge Friendly's discussion of this in Vanity Fair Paper Mills, Inc. v. FTC, 2 Cir., 1962, 311 F.2d 480, 487–488.

stores did not "induce or encourage" employees of those stores to engage in a strike or refusal within the meaning of § 8(b) (4) (i) (B). See United Wholesale & Warehouse Employees, Local 261 v. N. L. R. B., 1960, 108 U.S. App.D.C. 341, 282 F.2d 824; N. L. R. B. v. General Drivers, Warehouse & Helpers, Local 968, 5 Cir. 1955, 225 F.2d 205, 210, 211.

I therefore concur in part and dissent in part.